**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-20269-STA-dkv** |
| | ) | |
| **ELVIS ANDERSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

### ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPPRESS AND MOTION TO DISMISS

---

Before the Court is Defendant Elvis Anderson's Motion to Suppress (D.E. # 25) and Motion to Dismiss (D.E. # 26), both filed on January 26, 2011. Defendant filed a Supplemental Motion to Suppress (D.E. # 49) on April 28, 2011. These matters were referred to the United States Magistrate Judge for report and recommendation. Pursuant to the order of reference, the Magistrate Judge conducted hearings on May 19, 2011, and June 20, 2011. The Magistrate Judge issued separate reports recommending that both Motions be denied. Defendant has filed timely objections to the Magistrate Judge's reports. For the reasons set forth below, the Court adopts the Magistrate Judge's report and recommendation. Therefore, Defendant's Motion to Suppress and Motion to Dismiss are **DENIED**.

### BACKGROUND

Defendant has objected only in part to the Magistrate Judge's proposed findings of fact. The

Court will address each of Defendant's objections to the report's proposed factual findings in due course. Having reviewed the testimony about Defendant's arrest, the parties' briefs, and the entire record in this case, the Court hereby adopts the Magistrate Judge's proposed findings of fact as follows.

## I. The Arrest

On the morning of Monday, May 17, 2010, at approximately 9:10 a.m., Officer Kevin Day responded to a dispatch call regarding an alleged robbery of a Memphis "Tan 'n Go" business, located at 5035 Park Avenue. Officer Day arrived at the Tan 'n Go, accompanied by his partner, Officer T. Barrett, and spoke with victim Kelly Berry. According to Officer Day's testimony, Ms. Berry told the officers that a black male had entered the store, asked her for the money in the cash register, and threatened her. Ms. Berry described the man as being in his mid-thirties, approximately six feet tall, weighing approximately two-hundred pounds, and wearing black pants or shorts, a white t-shirt, and a black hat with white letters. Ms. Berry also indicated the direction the suspect ran after leaving the Tan 'n Go. Officer Day then broadcast a description of the suspect to other patrol cars in the area. Officer David Keith Boggan, who was patrolling the area near the Tan 'n Go, responded to Officer Day's broadcast and began searching the area for anyone matching the description of the suspect. According to Officer Boggan's testimony, he spotted Defendant Elvis Anderson walking quickly through the Eastgate Shopping Center parking lot, towards a Home Depot store, located at 800 Truse Road. Officer Boggan testified that Defendant fit the broadcast description and that he radioed dispatch to inform them he had spotted a suspect. Officer Boggan remained in his squad car while he waited for backup and did not turn on his blue lights or signal for Defendant to stop. According to Officer Boggan's testimony, Defendant attempted to run when he spotted the squad

car but was unable to run for a long distance before walking again.

After an additional squad car arrived, Officer Boggan testified that Defendant again attempted to run. Officer Boggan, along with two other officers, apprehended him and explained that he matched the description of a robbery suspect and was being detained. Officer Boggan then handcuffed Defendant for safety purposes, placed him in the squad car, and informed his supervisor that he had detained a possible suspect in the Tan 'n Go robbery. Sergeant Timmie Wilson's Robbery Supplement (Ex. 16) also indicates that officers patted down and searched Defendant, finding car keys to a Ford vehicle. Defendant informed the officers that he drove a late-model Ford Taurus that was parked at the Paradiso Theater, located at 584 South Mendenhall Road. Officer Boggan testified that he did not question the witness in any way. Sergeant Wilson of the MPD testified that Lieutenant Jay Locastro, an MPD officer and a supervising officer with the Safe Streets Task Force, learned of Defendant's apprehension and contacted him and Detective Steven Lovelace of the Germantown Police Department to inform them.

Sergeant Wilson and Detective Lovelace are both assigned to the Safe Streets Task Force. The Safe Streets Task Force is a unit comprised of both state and federal agents from the FBI, the Memphis Police Department, Shelby County Sheriff's Department, Germantown Police Department, and Bartlett Police Department. The Safe Streets Task Force focuses primarily on car jacking incidents, bank robberies, and local business robberies that fall within the Hobbs Act, 18 U.S.C. § 1951 (2006). The task force had recently investigated a string of hotel robberies. The suspect in those robberies, referred to as the "Red Hat Hotel Robber," was described as a six-foot tall black male, weighing around 225 pounds, and wearing a red hat with white letters on it. Both Sergeant Wilson and Detective Lovelace testified that Lieutenant Locastro told them that Defendant had been

detained in an attempted Tan 'n Go robbery, but that he closely matched the description of the Red Hat Hotel Robber. Both Sergeant Wilson and Detective Lovelace made the scene in order to determine whether Defendant might also be involved in the hotel robberies.

Detective Lovelace testified that he first drove to the Tan 'n Go to speak with the victim, Ms. Berry. He drove her to the Home Depot scene, where she identified Defendant as the man who attempted to rob her. After Detective Lovelace left to take Ms. Berry back to her store, Sergeant Wilson arrived at the Home Depot scene. There, he confirmed that Defendant closely matched the description of the Red Hat Hotel Robber, noting the similarities in physical appearance and dress. Additionally, the keys officers found on Defendant were to a 2001 grey Ford Taurus. Sergeant Wilson testified that this was also the type of vehicle the Red Hat Hotel Robber used. Defendant was then transported downtown to the Robbery Bureau at Sergeant Wilson's request. Sergeant Wilson and Detective Lovelace testified that they found the car Defendant described in the Paradiso parking lot and that it looked similar to the car seen on surveillance footage from the hotel robberies.[1] The car Sergeant Wilson and Detective Lovelace found in the Paradiso parking lot appeared to be the same make and model, a 2001 grey Ford Taurus, as the car used in the robberies. It also had at least two numbers on its license plate in common with the car used in the robberies.

---

[1] Although Defendant testified at the second hearing that he did not tell the officers the location of the car, it is unlikely that Sergeant Wilson and Detective Lovelace would have been able to locate the car so quickly without information from Defendant. Sergeant Wilson testified that he and Detective Lovelace went immediately to the car from the arrest scene, a distance of over one-half mile. The distance makes it unlikely that the Paradiso parking lot would have been the first place they searched for Defendant's vehicle. Additionally, Sergeant Wilson and Detective Lovelace testified that they went to the Paradiso adjacent to the DoubleTree Hotel, 5069 Sanderlin Avenue, to check video surveillance based on Defendant's claim that he had made a phone call there. Based on these actions, the Court finds that Defendant did, in fact, disclose the location of his vehicle to the police.

Sergeant Wilson and Detective Lovelace reviewed video surveillance footage from the movie theatre and saw that an individual parked the Ford Taurus in the Paradiso lot shortly after midnight on May 17 and entered the DoubleTree Hotel.[2] Sergeant Wilson testified that the individual in the videotape appeared to be Defendant. After seeing the video, Sergeant Wilson had the car towed to the city lot for processing.

Defendant's account of his initial detention by police varies from the government's. Though the location and approximate time is consistent, Defendant denies involvement in the Tan 'n Go robbery and claims that the police forcefully detained him and held him without any explanation. Defendant testified that on the night of Sunday, May 16, 2010, he had car trouble and ran out of gas. As a result, he parked his car in the Paradiso Theater lot and walked to the DoubleTree Hotel to use the telephone. It is unclear based on Defendant's testimony what he did between the time he walked to the DoubleTree, shortly after midnight, Monday, May 17, and the time he was stopped by police officers around 9:15 a.m. on Monday morning, May 17, 2010. Defendant testified, however, that he was not at the Tan 'n Go at the time of the attempted robbery on the morning of May 17, 2010. Defendant testified that he was by the railroad tracks on his way to the Home Depot at around 9:15 a.m. to call his mother to ask for cash. He testified that his cell phone had died the night before and that he needed money to help with his car. As he walked towards the store, multiple police officers quickly approached him, drew their guns and detained him. Defendant denies that he ran or resisted the apprehension. Defendant testified that the officers patted him down, placed handcuffs on him, and put him in the back of a squad car. After Defendant was placed in the car, he could hear the

---

[2] The report states that Sergeant Wilson and Detective Lovelace reviewed the surveillance footage at the Double Tree Hotel when both actually testified that the footage was obtained from the Paradiso.

officers outside repeating, "It's him, it's him." He also noticed one officer continuously looking at his phone, then at Defendant. Defendant testified that he was eventually transported to the Robbery Bureau at 201 Poplar around 10:45 a.m.

With respect to the initial detention and arrest, the Magistrate Judge found the officers' testimony to be credible. Officer Boggan, Sergeant Wilson and Detective Lovelace's testimony and supplemental evidence presented at the hearing corroborated the order of events that occurred. The Magistrate Judge further found the officers' testimony regarding the interrogation of Defendant to be credible and accepted their version as fact. On the other hand, the Magistrate Judge found that Defendant's testimony regarding the circumstances of his arrest was not credible. The report questioned how, if Defendant ran out of gas as he claimed, he was able to properly park his car in a designated parking spot behind the DoubleTree Hotel. Additionally, the Magistrate Judge found contradictory Defendant's testimony that he used the phone in the DoubleTree a little after midnight after running out of gas but walked a considerable distance the next morning to the Home Depot to place a call. Defendant also offered no explanation as to his whereabouts between midnight and 9:15 a.m., the time of his arrest.

In his objections to the Magistrate Judge's report, Defendant argues without elaboration that "the circumstances of his arrest and detention are circumspect."[3] Def.'s Objs. to Report & Recom. 2 (D.E. # 78). Defendant's blanket objection fails to specify any factual finding about his initial detention and arrest or argue reasons why the Court should reject the Magistrate Judge's proposed findings. Moreover, aside from being vague, Defendant fails to demonstrate how the circumstances

---

[3] It is not clear what Defendant means by "circumspect," a word commonly defined as "cautious" or "careful." It appears that Defendant may have intended to describe the circumstances of his arrest as "suspicious."

of his initial detention and arrest, even if "circumspect," would go to the legal issues he has preserved in his objections to the report and recommendation. The only legal issues Defendant raises now are whether his waiver of his Miranda rights and statements to the police were voluntary and whether his speedy trial rights have been violated.[4] The Court holds that the facts of Defendant's initial detention and subsequent arrest are not relevant to these remaining legal issues.[5] For these reasons any objection to the report's findings of fact about the initial detention and arrest of Defendant on May 17, 2010 are overruled.

## II. Questioning at 201 Poplar

The report and recommendation notes that testimony regarding Defendant's continued detention and interrogation also varies significantly between Defendant and the interrogating officers: Detective Brian Beasley, Detective Lovelace, and Sergeant Wilson. According to the

---

[4] In his Supplemental Motion to Suppress, Defendant argues that any statements made subsequent to his arrest on May 17, 2010, are fruit of the poisonous tree because the police lacked probable cause to arrest him for the Tan 'n Go robbery. *See* Def.'s Supp. Mot. Suppress (D.E. # 49). The Magistrate Judge's proposed conclusion of law is that there was reasonable suspicion to detain Defendant for the Tan 'n Go robbery and later probable cause to arrest him for that offense. Defendant has not objected to this conclusion of law. Defendant has objected to the "factual implication" from the Magistrate Judge's report that Defendant "was involved in the robbery of the Tan 'n Go, a robbery with which he has never been charged," Def.'s Objs. to Report & Recom. 2 (D.E. # 78). The report did not find or imply that Defendant was involved in the robbery, only that the police had reasonable suspicion to detain Defendant at first and later probable cause to effectuate his arrest. It is not clear whether Defendant uses the phrase "factual implication" to mean reasonable suspicion or probable cause or something altogether different. In any event, Defendant has not objected to the Magistrate Judge's proposed conclusion of law that reasonable suspicion and probable cause existed. Therefore, Defendant has waived any objection to that portion of the report and recommendation.

[5] The Court notes that Defendant mentions the "circumspect" circumstances of his arrest as part of his larger objection to the Magistrate Judge's recommendation to credit the testimony of the police officers and not Defendant. To the extent that these facts are relevant to the overall credibility determination, Defendant has preserved the objection, and the Court will consider them below.

officers' testimony, Defendant was transported to the Robbery Bureau located at 201 Poplar Avenue around 11:45 a.m. on Monday, May 17, 2010. Detective Brian Beasley, another MPD officer assigned to the Safe Streets Task Force, testified that he arrived at the Robbery Bureau to assist in the Tan 'n Go attempted robbery investigation at the request of Detective Lovelace. Detective Beasley escorted Defendant to an interview room and offered Defendant food, drink, and a restroom break. Detective Beasley then took a written statement from Ms. Berry, the victim of the attempted robbery victim Tan 'n Go. He continued to check on Defendant hourly, offering food, drink and restroom breaks until 2:00 p.m., when, according to Detective Beasley's Robbery Supplement (Ex. 3), Defendant received a meal of chicken tenders, a roll, and coke. According to Detective Beasley's testimony, he did not question Defendant at all during that time, because he was waiting for the case coordinator, Sergeant Wilson, to arrive. Detective Beasley supervised Defendant until later that afternoon.

When Detective Beasley had to leave 201 Poplar, Detective Walter Gunn took over custody of Defendant until Sergeant Wilson was prepared to question him. Sergeant Wilson testified that he arrived at 201 Poplar around 3:20 p.m., after having Defendant's car towed to the city lot. Sergeant Wilson checked in with Defendant quickly, asking him if he needed any food, drink, or a restroom break, all of which Defendant refused. Sergeant Wilson then went to the conference room of the Robbery Bureau where he met with other officers to issue instructions and to develop an investigation strategy. He then went back to the squad room to follow up on Defendant's car. Sergeant James Taylor of the MPD prepared a warrant to search the car, which Judge Chris Craft signed. At that point the crime scene investigators processed the vehicle. Detectives Beasley and Smith were able to determine that the car was registered to Ms. LeTara Rice. The officers contacted

Ms. Rice, who identified herself as Defendant's girlfriend, and she agreed to come to 201 Poplar for an interview.

Ms. Rice came to the Robbery Bureau around 5:00 p.m. and spoke with Sergeant Wilson. According to Sergeant Wilson's testimony, Ms. Rice told him that both she and Defendant used her car and that Defendant had been in possession of her car since Friday, May 14, 2010, three days prior to the Tan 'n Go attempted robbery. She agreed to look at still photos taken from surveillance footage of the hotel robberies. She identified her vehicle and Defendant in the photos and signed and dated the photos indicating that she was able to recognize and identify them. Sergeant Wilson then asked for consent to search Ms. Rice's home in order to look for more evidence that might connect Defendant to the Red Hat Hotel Robberies. Specifically, Sergeant Wilson testified he wanted to search for property that might have been stolen from the hotels. Ms. Rice gave her consent to the search.[6] Sergeant Wilson testified that Detectives Beasley and Lovelace executed the search at Ms. Rice's home.

After Sergeant Wilson instructed the detectives to execute a search of Ms. Rice's home, around 8:00 p.m., he and Detective Gunn began questioning Defendant. They advised Defendant of his Miranda rights, and Defendant initialed and signed the Advice of Rights form. (Ex. 5.) This

---

[6] The Magistrate Judge's report noted some confusion about the location of the search. According to Sergeant Wilson's testimony, Ms. Rice's vehicle registration listed her as living in Dyersburg. However, Sergeant Wilson's Case Supplement (Ex. 16) stated that the car was registered to Ms. Rice at 29 East Desoto Avenue, which is a Memphis address, not a Dyersburg address. Additionally, his testimony indicated that after Ms. Rice gave permission to search her home, the search was executed at a residence located at 1101 S. Avalon, Apartment B-5, in West Memphis, Arkansas. This is the address Defendant listed on his Robbery Defendant Statements as being his principal place of residence. (Exs. 6, 10, & 12.) The Magistrate Judge correctly observed that Defendant's Motion to Suppress was not directed toward any evidence seized from the search of the residence.

form included questions that asked whether Defendant was under the influence of drugs or alcohol and whether he was experiencing any physical discomfort that might prevent Defendant's participation. Defendant answered "no" to both questions. (Ex. 5.)

Sergeant Wilson first questioned Defendant about one of the robberies committed by the Red Hat Hotel Robber on April 30, 2010, a robbery at Fairfield Inn, 6010 Macon Cove in Memphis. According to Sergeant Wilson's testimony, Defendant initially denied involvement in the robbery. Sergeant Wilson then presented Defendant with the photos taken from hotel video surveillance at the Fairfield Inn and the photos signed by Ms. Rice, Defendant's girlfriend, identifying her vehicle and Defendant in the pictures. After Sergeant Wilson told Defendant that "anyone could see" that it was Defendant in the photos, Defendant admitted that it was, in fact, him. Sergeant Wilson prepared a written statement, and Defendant signed and dated the statement around 9:20 p.m. on May 17, 2010, initialing each page. (Ex. 6.)[7] Defendant also signed and dated both surveillance photos, identifying himself and Ms. Rice's car. (Exs. 7, 8.)

Following the completion of the first written statement, Sergeant Wilson questioned Defendant about the other robberies committed by the Red Hat Hotel Robber. Defendant admitted to involvement in twenty-one other robberies and attempted robberies. Sergeant Wilson and Detective Gunn prepared five more written statements with Defendant, starting at 9:30 p.m. and ending at 12:07 a.m. Defendant signed, initialed, and dated each of the five statements. (Collective Ex. 10.) Sergeant Wilson testified that Defendant ate pizza for dinner while the statements were being prepared and that he was also given restroom breaks. At that point, Sergeant Wilson and the

---

[7] Although the Magistrate Judge's report indicated that Defendant signed the statement at 8:16 p.m., Sergeant Wilson testified that he began typing up the statement at 8:16 and Defendant read and signed the final copy at 9:20 p.m.

other officers decided to break for the night because both Defendant and the officers were getting tired and that they planned to resume the next day. According to Sergeant Wilson, Defendant was talkative and candid about his involvement throughout the questioning. Defendant explained that he had previously been held by police in a similar matter in Middle Tennessee. Defendant told Sergeant Wilson that because Defendant had been so forthcoming about his participation in those previous alleged crimes, the court was lenient in his sentencing. Even though Defendant said he hoped to receive the same treatment in Memphis as a result of admitting his involvement in the robberies, Sergeant Wilson testified that he made no promises to Defendant. Sergeant Wilson also testified that he did not coerce or threaten Defendant in any way regarding his admission to the robberies and attempted robberies.

After Sergeant Wilson and Detective Gunn left the interview room, they went back to the Robbery Bureau and started paperwork to admit Defendant to the jail at 201 Poplar for the night. Sergeant Wilson and Detective Lovelace testified that they, along with Lieutenant Locastro, decided to transport Defendant to the Germantown jail instead because holding him there would be more helpful to the investigation. Detective Lovelace testified that the Germantown jail was more secure for Defendant, as he would not be able to communicate with others who might negatively influence his decision to cooperate with police. Sergeant Wilson also explained that Germantown jail does not require an arrest ticket or explanation for a 48-hour hold. Additionally, two of the Red Hat Hotel Robberies took place in the Germantown area, and Germantown detectives, including Detective Lovelace, would be able to question Defendant about those crimes. Lieutenant Locastro radioed for a transport car, at which point Lieutenant Locastro, Detective Lovelace, and Sergeant Wilson placed Defendant in the car and followed in separate vehicles to Germantown. Sergeant Wilson testified

11

that once Defendant was checked in at the Germantown jail, there was no further contact between Defendant and the investigators that night.

After leaving Germantown jail around 1:30 a.m., Sergeant Wilson called two of the hotels robbed by the Red Hat Hotel Robber to see if the robbery victims were working that night. Upon learning that both victims were on duty that night, Sergeant Wilson went first to the Fairfield Inn, arriving around 2:00 a.m., and spoke with victim James Parsons. Mr. Parsons agreed to view a photo lineup to determine if he could identify the man who robbed him. Viewing photo spread A, Mr. Parsons identified Defendant as the robber, circled Defendant's photograph, wrote a short statement on the photo spread, and signed and dated it. (Ex. 17.) Sergeant Wilson then traveled to the Holiday Inn, 2751 New Brunswick Road, and spoke with victim Gwendolyn Landon. Sergeant Wilson testified that she also agreed to view a photo spread and proceeded to identify Defendant on the spread as the suspect who robbed her. Sergeant Wilson left the Holiday Inn around 3:00 a.m.

### III. Questioning at the Germantown Jail

Detective Steven Lovelace testified that he arrived at the Germantown jail around 10:45 a.m. on Tuesday, May 18, 2010. Upon arriving at the jail, Detective Lovelace took Defendant to an interview room, verbally advised him of his rights, and took two written statements from Defendant regarding the two Red Hat Hotel Robber incidents that had occurred in the Germantown area. (Exs. 18 & 19.) In the statements, Defendant admitted to robbing the Comfort Inn at 7787 Wolf River and the Homewood Suites at 7855 Wolf River. Detective Lovelace testified that he was alone with Defendant in the interview room but that the interviews were videotaped. Detective Lovelace typed the written statements on a laptop as Defendant answered questions and then printed them out for Defendant to review. Defendant initialed each page of the statements and signed and dated the last

12

page of each statement. These statements included an explanation of Defendant's Miranda rights, which Defendant initialed, indicating he knew and understood them.

Sergeant Wilson arrived at the Germantown jail around 12:00 p.m. He brought a secretary, identified on the Robbery Supplement as L. Watts (Ex. 16), from the Robbery Bureau at 201 Poplar to assist in transcribing the statements. He also brought a meal from McDonalds for Defendant. Defendant was also given a restroom break. Sergeant Wilson and Detective Lovelace then advised Defendant of his *Miranda* rights again and proceeded to take fifteen written statements from him regarding the hotel robberies. The first statement started at 1:18 p.m. and the last statement started at 6:25 p.m. Both Sergeant Wilson and Detective Lovelace testified that Defendant appeared coherent, talkative and normal throughout the entire interview. Both also testified that no verbal or physical threats were made and that Defendant stated that he simply wanted to put the whole matter behind him. After Sergeant Wilson and Detective Lovelace finished taking the statements, Defendant was given another restroom break and ate dinner from Subway. Defendant was checked back into the Germantown jail around 7:00 p.m. where he stayed for the night.

On Wednesday, May 19, 2010, Sergeant Wilson prepared the arrest ticket for Defendant to be admitted into 201 Poplar. (Ex. 13.) Sergeant Wilson and the other officers decided to charge Defendant with one count of aggravated robbery of the Fairfield Inn. Sergeant Wilson testified that despite the fact that Defendant was initially detained for the Tan 'n Go attempted robbery, the Fairfield Inn robbery would be the strongest charge because it was a completed robbery in which Defendant was armed and the gun was visible on the video. Sergeant Wilson had started filling out the arrest ticket two days before, on May 17, before deciding to send Defendant to the Germantown jail. Sergeant Wilson testified that rather than rewrite an entirely new ticket, he used white-out on

the original date, "05/17/2010," and wrote "5/19/2010" over it. He also changed the time of day to "14:38 hours." Sergeant Wilson testified that he did, however, forget to change the day from Monday to Wednesday. The arrest ticket still has Monday typed on it. (Ex. 13.) The arrest ticket reflects "Safe Streets Task Force" as the unit involved. (*Id.*) Sergeant Wilson also prepared the bond ticket and the Affidavit of Complaint (Ex. 14), both of which are required for a formal charge.

The Fairfield Inn robbery charge against Defendant was initially filed in state court. On Wednesday, May 19, 2010, Sergeant Wilson swore out a complaint in the General Sessions Criminal Court, State of Tennessee, Shelby County against Defendant for the armed robbery of the Fairfield Inn and a warrant was issued for Defendant's arrest. (Ex. 14.) Sergeant Wilson and Detective Beasley testified that in the Safe Streets Task Force, it is common to file charges in state court first, then transfer that case to whichever office would be best suited to prosecute the case. Defendant's initial court appearance in state court on the Fairfield Inn robbery charge was Thursday, May 20, 2010, at which time a bond was set. Sergeant Wilson stated that because Defendant's bond for the state case was set so low, a federal criminal complaint for the Fairfield Inn robbery was sworn out on May 20, 2010, before a United States Magistrate Judge. On July 20, 2010, a federal grand jury returned an indictment charging Defendant with interfering with commerce by robbery of the Fairfield Inn in Memphis, Tennessee, a business then engaged in interstate commerce, in violation of 18 U.S.C. § 1951, and carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). (D.E. # 3.) On October 27, 2010, Defendant was arrested on the federal indictment, taken into custody, and brought before a United States Magistrate Judge for an initial appearance. (D.E. # 7.) It is undisputed that charges were never filed in state or federal court with respect to the attempted robbery of the Tan 'n Go. Furthermore, there was no proof that

14

Defendant ever made the state court bond. Rather, it appears that Defendant remained in state custody on the state robbery charge until he was picked up on a writ for an appearance in federal court on October 27, 2010, on the federal robbery charge.

## IV. Defendant's Account of the Interrogations

The Magistrate Judge reported that Defendant's account of his interrogation is markedly different from Sergeant Wilson and Detective Lovelace's account. Defendant testified that he was interrogated almost immediately upon arriving at the Robbery Bureau on May 17, 2010, and that he was threatened and coached throughout the duration of his detention. Defendant testified that he was transported from the Home Depot to the Robbery Bureau at 201 Poplar around 10:45 a.m, on Monday, May 17, 2010. According to Defendant, about ten minutes after he was placed in the interview room, Sergeant Wilson and Detective Gunn entered the room and started questioning him. Defendant testified that he was not informed of his Miranda rights at that time. Defendant testified that Detective Gunn told him he did not like liars and if Defendant lied to him there would be nothing they could do to help him. Defendant also testified that Sergeant Wilson accused him of being the Red Hat Hotel Robber. Defendant said that the officers told him that his girlfriend, Letara Rice, was present and that if Defendant did not cooperate and tell them what they wanted they would place Ms. Rice under arrest. Defendant testified that he stood up in response and that despite Defendant's handcuffs, Sergeant Wilson punched him in the stomach, causing him to lay down on the ground. Sergeant Wilson told Defendant that an officer would arrest his girlfriend and then left the room.

According to Defendant, Sergeant Wilson reentered the room after about thirty minutes and started asking Defendant questions again and writing things down. Defendant testified that he did

15

not know how much time had passed or what the officers were writing down. Defendant refused to sign anything. After a period of questioning, Defendant testified that Detective Lovelace entered the room with a big bag full of clothes. He showed them to Defendant and told him that the bag was enough evidence to "get him life in prison." Defendant testified that Detective Lovelace also told him that his girlfriend had identified him in some photographs and that she had given consent for the police to search Defendant's mother's home, despite the fact that Defendant did not live there. Defendant testified that after a prolonged period of questioning, the interviewing officers finally read him his Miranda rights. Defendant insisted that he wanted a lawyer, but, according to Defendant, the officers informed him that he had to sign the written statements in order to get an attorney. Defendant further testified that he agreed to sign the statements for three reasons: (1) he believed that signing was necessary in order to obtain an attorney; (2) the officers were threatening to take away his girlfriend and his child; and (3) they were threatening that Defendant would receive a life sentence in prison, saying that they were "the Feds" and that "you can't beat the Feds." Defendant testified that Sergeant Wilson told him if he cooperated and signed the forms, he could promise that Defendant would only receive a ten-year sentence and that Sergeant Wilson would return the car to Ms. Rice and not arrest her for anything. Defendant said he asked the guard who was present to remember what Sergeant Wilson promised but made no mention of the guard's name in his testimony.

Defendant testified that he signed and dated the statements after Sergeant Wilson had finished typing all of them. He also testified that he wrote the specific times on each of them according to Sergeant Wilson's instructions, although he signed them all at approximately the same time. Defendant testified that he told Sergeant Wilson and Detective Lovelace that he would not be

able to memorize the details from the statements all at once because he was tired after all the questioning. Defendant also testified that he was transported to Germantown jail with a copy of each of the statements he had signed with instructions to study them overnight and memorize all the information, including where the hotels were and what clothes he was supposed to have worn when he robbed them.

Detective Lovelace met with Defendant on Tuesday morning, May 18, 2010, around 10:45 a.m., at which time, Defendant said he had finished reading the statements written the day before. Defendant was questioned again throughout the day and claims he was coerced into making fifteen additional written statements regarding the hotel robberies. Defendant testified that officers would not permit him to make a phone call and would not tell his mother where he was being held. According to Defendant, he spent the night between May 18 and May 19 signing and dating the rest of the written statements pursuant to Sergeant Wilson's instructions. When asked why he signed the rest of the statements if he knew they were false, Defendant testified that his girlfriend and his children were the most important thing to him and that if signing the statements helped them stay out of trouble, he would do it. Defendant admitted having been to jail previously but testified under oath that he would never have signed the statements voluntarily.

## V. Credibility on the Questioning of Defendant

With respect to the interrogation, the Magistrate Judge credited the testimony of the investigating officers and found the Defendant to be not credible. First, the Magistrate Judge did not credit Defendant's account of Sergeant Wilson punching him in the abdomen. The report notes that there is no evidence, other than Defendant's testimony, that Sergeant Wilson physically attacked or harmed Defendant at any point during the questioning. Sergeant Wilson testified that he did not

arrive at the Robbery Bureau to question Defendant until after 3:00 p.m. and was accompanied by Detective Gunn at all times. Sergeant Wilson's account is also supported by the Robbery Supplement. (Ex. 17.) There was no inconsistent testimony from Detective Beasley or Detective Lovelace regarding the events surrounding Defendant's detention and questioning. Defendant even testified that he made no mention of being struck by Sergeant Wilson to any other officers or to his attorney. Based on these facts, the Magistrate Judge concluded that there was no basis for the physical assault allegation.

Having reviewed the testimony presented to the Magistrate Judge and the entire record of the case, this Court finds that Defendant's testimony about being struck is not credible. In addition to the reasons the Magistrate Judge offered in support of her conclusion, the Court observes that Defendant's testimony about the punching is contradicted by the timeline of events on May 17. Defendant placed the punching incident relatively early in the day. According to Defendant, Sergeant Wilson began the interrogation soon after Defendant arrived at 201 Poplar at 10:45 a.m.[8] Defendant stated that Sergeant Wilson struck him after Wilson mentioned possible criminal charges against Defendant's girlfriend and Defendant rose to his feet in an apparent protest. The punching incident allegedly occurred during this first part of the interrogation, perhaps as early as the 11:00 hour. However, the rest of the record evidence shows that Sergeant Wilson was not even present at 201 Poplar until after 3:00 p.m. and that the interrogation did not commence until approximately 8:00 p.m. Sergeant Wilson was involved in other aspects of the investigation such as processing Defendant's vehicle for impoundment and identifying the owner of the vehicle, Defendant's

---

[8] Defendant also testified that Detective Gunn was present at the time of the punching. Other record evidence shows that Gunn was not on duty at 201 Poplar until 2:00 p.m.

girlfriend Ms. Rice. What is more, Defendant went on to testify that Ms. Rice came into the interrogation room soon after the punching incident. However, the record shows that Ms. Rice did not arrive at 201 Poplar for questioning until 5:00 p.m. It is not even clear that Ms. Rice was known to the police as Defendant's girlfriend as early as the 11:00 hour. Ms. Rice was not identified as the owner of the car until some time later in the day. Therefore, the Court finds that not only is Defendant's allegation of the assault uncorroborated, Defendant's story is undermined by other record evidence. As a result, the Court adopts the Magistrate Judge's proposed finding of fact on this point.

Second, the Magistrate Judge did not accept Defendant's argument that he was suffering from cocaine withdrawal at the time he was questioned and that his compromised condition was tantamount to physical coercion. In his Motion papers, Defendant claimed that the interrogating officers took advantage of Defendant's withdrawal and denied him medical assistance. The Magistrate Judge reported that there was no mention of either this allegation or of Defendant's drug use during the hearing. In fact, Defendant appeared to recall his interview with great clarity, testifying that he remembered what was said, that he was coherent during the interview, and that he stayed up overnight studying and reading statements. The report found that this testimony conflicted with the allegations in Defendant's Motions. Furthermore, Defendant emphatically denied any drug use in his handwritten, *pro se* motion to dismiss counsel (D.E. # 54.) Thus, the Magistrate Judge concluded that Defendant had abandoned his allegation relating to his drug use and compromised physical condition. Because Defendant has not specifically objected to this finding in his objections and otherwise failed to offer any proof of cocaine withdrawal at the time of his interrogation, the Court adopts the Magistrate Judge's proposed finding of fact.

Third, the Magistrate Judge considered Defendant's testimony that the officers made verbal threats against him during the interrogation. According to Defendant, Sergeant Wilson promised leniency but also told Defendant that Ms. Rice would be arrested unless Defendant confessed to the crimes. Defendant also testified to his belief that his children with Ms. Rice would be placed in foster care if he did not cooperate. All of the officers who participated in the questioning denied Defendant's allegation about any such threats. The Magistrate Judge appears to have rejected Defendant's allegations about the verbal threats, noting that Defendant's claim was supported only by his own testimony. This Court agrees that Defendant's testimony is not entitled to credibility. According to Defendant, Sergeant Wilson punched him just after Wilson threatened to arrest Ms. Rice. Defendant then stated that Ms. Rice entered the room a short time after the alleged assault. As the Court discussed previously, Defendant's account is contradicted by the fact that neither Sergeant Wilson nor Ms. Rice were present at 201 Poplar as early as Defendant places them there. Just as the Court found Defendant not credible about the punching incident, the Court also finds Defendant's allegation of the threat to arrest Ms. Rice not credible for the same reasons.

The Magistrate Judge went on to consider whether even accepting Defendant's testimony as true, the types of conduct he described would rise to the level of coercion as a matter of law. The Magistrate Judge concluded that they would not. In his objections to the report, Defendant "object[ed] to all findings of fact that his interrogations involved no verbal threats, coercive tactics, or physical intimidation." Because the Magistrate Judge proceeded to her legal analysis, the Court will review the Magistrate Judge's proposed conclusion of law below.

Defendant has raised one other objection to the report's proposed findings of fact. Defendant argues that the uniformity of the Magistrate Judge's credibility determination could be indicative of

possible bias based on the status of the police officers as government agents. The cases upon which Defendant relies do not actually support his position. For example, the Eleventh Circuit held that "in order to amount to reversible error, a judge's remarks must demonstrate such pervasive bias and unfairness that they prejudice one of the parties in the case."[9] In the case at bar, Defendant fails to point to any specific comment made by the Magistrate Judge in the hearing or any statement included in her report to indicate such "pervasive bias." It is true that the Magistrate Judge credited the testimony of all of the government agents involved in this case and found Defendant to be not credible. In each instance, however, the Magistrate Judge emphasized the record evidence that corroborated the officers' version of events as well as the consistency of their testimony. As for Defendant, the Magistrate Judge pointed out the lack of proof to support Defendant's testimony, the logical inconsistencies in his account, and even the unexplained holes in his story. Therefore, Defendant's objection that the Magistrate Judge showed bias in crediting the testimony of the officers is without merit and therefore overruled. Having set forth the findings of fact, the Court will now consider the merits of Defendant's objections to the legal conclusions recommended by the Magistrate Judge.

**STANDARD OF REVIEW**

Pursuant to 28 U.S.C. § 636, the Court may refer a motion to suppress in a criminal matter to a magistrate judge for the purpose of conducting an evidentiary hearing and to submit proposed findings of fact and recommendations for the disposition of the motion.[10] The Court must "make a de novo determination of those portions of the report or specific proposed findings or

---

[9] *United States v. Ramirez-Chilel*, 289 F.3d 744, 750 n.6 (11th Cir. 2002).

[10] 28 U.S.C. § 636(b)(1)(B).

recommendations to which objection is made."[11]  After reviewing the evidence, the Court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge.[12]  The Court need not review, under a de novo or any other standard, those aspects of the report and recommendation to which no specific objection is made.[13]  Rather the Court may adopt the findings and rulings of the magistrate judge to which no specific objection is filed.[14]

## ANALYSIS

In addition to his objections to the report's factual findings, Defendant has raised a number of objections to the Magistrate Judge's proposed legal conclusions.  With respect to the Motion to Suppress, Defendant first argues that the Court should suppress his statements admitting his involvement in the Red Hat Hotel Robberies because he did not knowingly and voluntarily waive his Miranda rights nor did he make and sign the statements voluntarily.  Second, Defendant contends that the Court should suppress the statements for violations of Federal Rule of Criminal Procedure 5(a).  With respect to the Motion to Dismiss the Indictment, Defendant argues that the Court should dismiss the charges against him for violation of his speedy trial rights.  The Court will analyze each of these objections in turn.

## I.  Motion to Suppress

A. Defendant's Confessions

---

[11] § 636(b)(1)(C).

[12] *Id.*

[13] *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

[14] *Id.* at 151.

Defendant objects to the recommendation that his Motion to Suppress be denied. Defendant maintains that the investigators coerced him into waiving his Miranda rights and then giving and signing the statements about his role in the Red Hat Hotel Robberies. Although Defendant has filed timely objections to the Magistrate Judge's application of the law, Defendant has not objected to the report's statement of the relevant law as to the voluntary nature of his confession. Therefore, the Court adopts that portion of the report as follows: a defendant's confession must be voluntary to be constitutionally valid under the Fifth and Fourteenth Amendments.[15] A voluntary confession is only admissible if it is made freely and without any type of compulsion or inducement.[16] Confessions are not considered free or voluntary if law enforcement officials obtain those confessions by overbearing the accused individual's will.[17] If a defendant asserts that his confession has been coerced by police, the government has the burden to prove, by a preponderance of the evidence, that the confession was voluntary.[18] The Sixth Circuit has set forth a three-prong test to determine whether a confession is involuntary:

> Threshold to the determination . . . is the requirement that the police "extorted [the confession] from the accused by means of coercive activity." Once it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the "coercion" in question was sufficient to overbear the will of the accused . . . Finally, petitioner must prove that his will was overborne *because of*

---

[15] *See, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 163 (1986).

[16] *See Wilson v. United States*, 162 U.S. 613, 623 (1896); *Haynes v. Washington*, 373 U.S. 503, 513 (1963).

[17] *See Haynes*, 373 U.S. at 513-14; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

[18] *Lego v. Twomey*, 404 U.S. 477, 488 (1972).

the coercive police activity in question.[19]

The first prong of this test requires that a defendant be able to identify specific misconduct on the part of the police which was the crucial motivating factor behind the accused's decision to confess.[20]  The second prong of the test requires that the court examine the defendant's subjective state of mind to determine whether the defendant's will was overborne by police activity.[21]  The third prong requires that courts determine whether the specific police misconduct was the crucial motivating factor in the defendant's confessions, and whether the police officers' coercive conduct did overbear the defendant's will.  An examination of the "totality of the circumstances" is necessary to determine whether the defendant's will was overborne.[22]  When assessing the totality of the circumstances, the court should consider the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep.[23]

Defendant objects to the report's conclusion that he knowingly waived his Miranda rights and then voluntarily confessed to his role in the Red Hat Hotel Robberies.  As previously discussed,

---

[19] *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988) (citations omitted).  *See also United States v. Mahan,* 190 F.3d 416, 422 (6th Cir.1999).

[20] *See Connelly*, 479 U.S. at 164.

[21] *See McCall*, 863 F.2d at 459; *United States v. Murphy*, 763 F.2d 202, 205 (6th Cir. 1985).

[22] *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994); *see also Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988).

[23] *See Ledbetter*, 35 F.3d at 1067 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

the report found that there was no support for Defendant's contention that he was punched by Sergeant Wilson or that Defendant was suffering narcotics withdrawals. The only type of coercive activity the Magistrate Judge analyzed was Defendant's claim that the police verbally threatened and coerced him in order to obtain his confession. The Magistrate Judge concluded that the alleged threats against Defendant did not rise to the level of objectively coercive behavior as a matter of law.

Even if the conduct was objectively coercive, the report went on to hold that there was no proof that the alleged coercion was sufficient to overcome Defendant's will or that the officers' behavior was the crucial motivating factor in Defendant's decision to give a statement. The Magistrate Judge reasoned that Defendant's will was not overborne, that he was knowledgeable about his rights, and that he cooperated to try to help himself. The report observed that Defendant was of at least average, if not above average, intelligence. Defendant was at the time 29 years old and had completed one year of college. Defendant further demonstrated an understanding of the legal process and the criminal justice system. Based on Defendant's admission that he had been arrested sixteen times, the Magistrate Judge found it improbable that Defendant had never been questioned by a police officer or read his Miranda rights. Finally, the report emphasized that the questioning was of limited duration, spread over a period of two days, and interposed with breaks for sleep, rest, and food. The Magistrate Judge concluded that under the totality of the circumstances, Defendant's will was not overborne and his statements were freely and voluntarily given.

Having reviewed this portion of the report and the record of the case de novo, the Court adopts the Magistrate Judge's proposed conclusion that the police's conduct was not objectively coercive. As previously discussed, the Court finds Defendant's allegation of the threat to arrest Ms.

Rice not credible. As a factual matter then, Defendant has failed to identify any coercive conduct on the part of the police. Even if the Court did credit Defendant's testimony that the police threatened to arrest Ms. Rice, the Court holds that such a threat was not the crucial motivating factor in Defendant's confession. As the Magistrate Judge noted, police are permitted to "play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible."[24] The Sixth Circuit has held that under certain circumstances threats to arrest family members may cause a confession to be involuntary.[25] In this case, even if the threat was made and was objectively coercive, there is no evidence that the alleged coercion was sufficient to overbear Defendant's will or that the threat to arrest Ms. Rice was a crucial motivating factor in Defendant's decision to confess.

First, the Court holds that under the totality of the circumstances, the alleged coercion was not sufficient to overbear Defendant's will. Defendant was twenty-nine years old at the time and had some education, including one year of college. Defendant admitted that he had many prior arrests, and the Magistrate Judge found that Defendant appeared to be familiar generally with the judicial system.[26] The evidence further shows that the police advised Defendant of his Miranda rights. Even if Defendant was questioned for a matter of hours spread over two days, the interrogation was not

---

[24] *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990).

[25] *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993).

[26] *United States v. Hunter*, 332 F. App'x 285, 289 (6th Cir. 2009) (noting that a defendant's prior experience in the criminal justice system is relevant to whether his will was overborne).

"of great duration."[27] The evidence also showed that Defendant was provided with adequate food and rest breaks. Nothing about the other circumstances of Defendant's questioning appears to be coercive. Therefore, the Court concludes that the totality of the circumstances surrounding Defendant's confession were not sufficient to overbear his will.

Second, the Court holds that whatever Defendant's subjective fears or beliefs may have been, the alleged threat to arrest Ms. Rice was not a crucial motivating factor in Defendant's decision to confess. Defendant testified that the police made the threat soon after Defendant was taken to 201 Poplar. Defendant admitted that after police made the threat, the police then informed him that Ms. Rice was cooperating in their investigation, giving consent to search Defendant's residence and even identifying Defendant in surveillance videos of the Red Hat Hotel Robberies. There is no evidence that police ever threatened Ms. Rice to coerce her cooperation. Defendant further stated that the police presented a large bag of unidentified clothing to Defendant, claiming that there was enough evidence to sentence Defendant to "life in prison." According to Sergeant Wilson's testimony, Defendant made the decision to cooperate with the hopes that he could "make a deal." Based on this evidence, the Court concludes that the alleged threat to arrest Ms. Rice was not a crucial motivating factor in Defendant's confession. Therefore, the Magistrate Judge's recommendation is **ADOPTED**, and Defendant's Motion to Suppress is **DENIED** as to the voluntariness of his confession.

## B. Violation of Rule 5 of the Federal Rules of Criminal Procedure

Defendant next objects to the report's conclusion that suppression is not required under Federal Rule of Criminal Procedure 5(a). Failure to comply with the requirement of Rule 5(a) that

---

[27] *United States v. Stokes*, 631 F.3d 802, 809 (6th Cir. 2011).

an arrested person be brought before a magistrate judge without unnecessary delay "renders inadmissible statements obtained from an accused prior to his appearance before a magistrate."[28] Delay is measured from the time federal custody begins.[29] Additionally, "[f]or the purposes of Rule 5(a) the time which a defendant spends in state custody will not be attributable to federal detention in the absence of some working relationship between state and federal law enforcement personnel."[30] Moreover, a valid waiver of one's Miranda rights constitutes a waiver of one's rights under Rule 5(a), including "the prompt judicial warning of one's constitutional rights."[31]

The Magistrate Judge recommended that Defendant's Motion be denied as to this issue. The report observed that although Defendant was initially arrested on May 17, 2010, Defendant did not enter federal custody until October 27, 2010. The record shows that Defendant was brought before a United States Magistrate Judge on the same day he was taken into federal custody. Under these facts, the Magistrate Judge found that there was no unnecessary delay between Defendant's federal arrest and his initial appearance before the United States Magistrate Judge. Defendant argued to the Magistrate Judge and raises as an objection here that an exception to Rule 5(a) exists in this case. According to Defendant, the Safe Streets Task Force is a collaborative, working relationship between state and federal officials such that the delay in this case should be measured from the time Defendant's state custody commenced. The Magistrate Judge concluded that this exception did not

---

[28] *United States v. Garner*, 46 F. App'x 278, 288 (6th Cir. 2002) (quoting *United States v. Barlow,* 693 F.2d 954, 958 (6th Cir.1982)).

[29] *Id.*

[30] *Id.*

[31] *Id.*

apply because there was no evidence that the Safe Streets Task Force was a collusive working relationship between state and federal agencies existing to circumvent the requirements of Rule 5(a). Therefore, the exception to Rule 5(a) did not apply.

In the alternative, the Magistrate Judge recommended that the Motion be denied because Defendant made a valid waiver of his Miranda rights before giving his statement to the police. The report stated that a valid waiver of Miranda rights included the waiver of rights under Rule 5(a). While Defendant has objected that his waiver of Miranda rights was not voluntary, Defendant has not objected to the specific conclusion of law that his waiver of Miranda rights included the waiver of his rights under Rule 5(a). Because the Court holds that Defendant's waiver of his Miranda rights was knowing and voluntary, the Court concludes that Defendant also waived his rights under Rule 5(a). For this reason alone, the Court adopts the report and denies Defendant's Motion as to this issue.

Furthermore, the Court holds that the exception to Rule 5(a) discussed above is not applicable in this case. There is no evidence that the Safe Streets Task Force is a collusive relationship between state and federal agencies, which exists for the purpose of circumventing the requirements of Rule 5(a). It is undisputed that the Safe Streets Task Force is a collaboration between the Federal Bureau of Investigation and the Memphis Police Department and other local law enforcement agencies. There is no evidence that the Safe Streets Task Force, however, exists for an "illegitimate" purpose or "to produce evidence which would not be admissible if the defendant were in federal custody the entire time."[32] As a result, Defendant's time spent in state custody is not

---

[32] *Barlow,* 693 F.2d at 958-59.

attributable to federal detention, and this exception to Rule 5(a) does not apply in this case. Therefore, the report is **ADOPTED** and Defendant's Motion to Suppress is **DENIED** as to this issue.

## II.     Motion to Dismiss the Indictment

The United States Magistrate Judge has entered a separate report and recommendation on Defendant's Motion to Dismiss the Indictment, proposing that the Motion be denied.  Defendant has filed timely objections to the Magistrate Judge's recommended disposition.  Defendant argues that his arrest on May 17, 2010 triggered the running of the 30-day period to bring an indictment under the Speedy Trial Act.  Section 3161(b) of the Speedy Trial Act provides in pertinent part: "Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges . . . ."[33]  The Speedy Trial Act further provides that in the case of an individual against whom a complaint is filed, if no indictment or information is filed within the time limit specified by §3161(b), the charges contained in the complaint shall be dismissed.  18 U.S.C. § 3162(a)(1). The 30-day time limit specified in §3161(b) is only triggered by a federal arrest on federal charges; it is not triggered by a state arrest or time spent in state custody.[34]  The triggering event is the arrest not the filing of a complaint.  As the Sixth Circuit noted,

> [t]here appears to be an inconsistency in the language of the statute in that under the time limit section of §3161(b), the triggering event is the arrest or service of summons.  Under the sanction section of §3162(a)(1), the [Speedy Trial] Act refers to the filing of a complaint as a starting point. Courts have construed the applicable starting point under §3162(a)(1) to

---

[33] 18 U.S.C. § 3161(b).

[34] *United States v. Copley*, 774 F.2d 728, 729 (6th Cir. 1985).

be the point of arrest. Since the complaint is merely a document on which action may or may not be taken, and on which notice may not be given the accused, it is correct to construe §3162(a)(1) as operating from the date of arrest or summons rather than the complaint.[35]

The Magistrate Judge recommended that Defendant's Motion to Dismiss the Indictment be denied. The federal grand jury returned the indictment against Defendant on July 20, 2010, and Defendant was arrested on the federal charges on October 27, 2010. As a result, the indictment was returned well before Defendant's arrest and within the time set by the Speedy Trial Act. The Magistrate Judge further found that there was no evidence that Defendant's arrest on state charges was a device to temporarily detain Defendant while federal authorities decided to prosecute. The record actually showed that the officers on the Safe Streets Task Force decided to bring the federal charges only because Defendant's bond on the state charges was set low. Thus, the Magistrate Judge rejected Defendant's contention that the Speedy Trial Act's 30-day time limit began to run when he was arrested on May 17, 2010, and more than sixty-four days had passed since his arrest when the federal indictment was returned in July 2010.

In his objections, Defendant argues that he was arrested by state and federal agents and then held on state robbery charges until federal authorities were prepared to move forward with the federal prosecution of the same offense. The state charges were dismissed without an indictment the day prior to Defendant's formal transfer to federal custody. Defendant maintains that the government used the state charges as a device to detain him and never intended to pursue the state charges once the federal government chose to prosecute him. Therefore, the charges should be dismissed for violation of the Speedy Trial Act.

---

[35] *Copley*, 774 F.2d at 730 (internal citations omitted).

The Court holds that there was no violation of the Speedy Trial Act in this instance. The indictment on the federal charges was returned on July 20, 2010, months prior to Defendant's arrest and being taken into federal custody on October 27, 2010. It is undisputed then that there was no violation of Defendant's speedy trial rights under these facts. The Court is likewise not persuaded by Defendant's unsupported theory that the Safe Streets Task Force colluded to detain him in state custody until such time as the federal authorities made the decision to prosecute him on federal charges and thereby avoid the requirements of the Speedy Trial Act. Defendant has adduced no evidence of improper collusion or an intent by the Safe Streets Task Force to use the state arrest as a device to temporarily detain Defendant while the federal authorities decided to prosecute. As the Magistrate Judge correctly pointed out, the evidence showed that the only reason the officers filed the federal complaint was because the state court set a low bond on Defendant's state charges. In the absence of some proof that the state and federal authorities actually used Defendant's arrest to detain him for the purpose of avoiding a speedy trial violation, the Magistrate Judge's report is **ADOPTED**, and Defendant's Motion to Dismiss is **GRANTED**.

## CONCLUSION

The Court **ADOPTS** the Magistrate Judge's report and recommendation on Defendant's Motion to Suppress and Motion to Dismiss the Indictment. Therefore, both Motions are **DENIED**.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: January 20, 2012.